Magistrate Judge Michelle L. Peterson

_____ FILED _____ ENTERED
_____ LODGED _____ RECEIVED

**JAN 0 8 2026**

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                          DEPUTY

# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. MJ26-011 |
| Plaintiff | COMPLAINT for VIOLATION |
| v. | Title 21, U.S.C. Sections 841, 846 |
| 1. LUIS DONALDO GALEANA GARCIA, 2. JUAN CARLOS GARNICA PACHECO, 3. LORENA ESQUIVEL, and 4. DUSTIN RAY BINION, | |
| Defendants. | |

BEFORE the Honorable Michelle L. Peterson, United States Magistrate Judge, U.S. Courthouse, Seattle or Tacoma, Washington.

The undersigned complainant being duly sworn states:

## COUNT ONE

### (Conspiracy to Distribute Controlled Substances)

Beginning at a time unknown, and continuing until at least January 8, 2026, in Whatcom County, within the Western District of Washington, and elsewhere, LUIS DONALDO GALEANA GARCIA, JUAN CARLOS GARNICA PACHECO, LORENA ESQUIVEL, and DUSTIN RAY BINION, and others known and unknown, did knowingly and intentionally conspire to distribute controlled substances, including:

Complaint - 1
*United States v. GALEANA GARCIA, et. al. / MJ26-011*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    cocaine, methamphetamine and N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl]

2    propanamide (fentanyl), substances controlled under Title 21, United States Code.

3       It is further alleged that with respect to LUIS DONALDO GALEANA GARCIA,

4    JUAN CARLOS GARNICA PACHECO, LORENA ESQUIVEL, and DUSTIN RAY

5    BINION, their conduct as members of the conspiracy charged in Count 1, which includes

6    the reasonably foreseeable conduct of other members of the conspiracy charged in Count

7    1, involved 50 grams or more of methamphetamine, its salts, isomers, or salts of its

8    isomers, and 500 grams or more of a mixture or substance containing a detectable amount

9    of methamphetamine, in violation of Title 21, United States Code, Sections 841(b)(1)(A).

10      It is further alleged that with respect to LUIS DONALDO GALEANA GARCIA,

11    JUAN CARLOS GARNICA PACHECO, LORENA ESQUIVEL, and DUSTIN RAY

12    BINION, their conduct as members of the conspiracy charged in Count 1, which includes

13    the reasonably foreseeable conduct of other members of the conspiracy charged in Count

14    1, involved five kilograms or more of cocaine, its salts, optical and geometric isomers,

15    and salts of isomers, in violation of Title 21, United States Code, Sections 841(b)(1)(A).

16      All in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

17                   **<u>COUNT 2</u>**

18    **(Possession of a Controlled Substance with Intent to Distribute)**

19      On or about September 16, 2025, in Whatcom County, within the Western District

20    of Washington, LUIS DONALDO GALEANA GARCIA, JUAN CARLOS GARNICA

21    PACHECO, LORENA ESQUIVEL, and DUSTIN RAY BINION, did knowingly and

22    intentionally possess, with the intent to distribute, and aid and abet the possession of,

23    with the intent to distribute, a controlled substance, including: cocaine, a substance

24    controlled under Title 21, United States Code.

25      It is further alleged that the offense involved five kilograms or more of cocaine, its

26    salts, optical and geometric isomers, and salts of isomers, in violation of Title 21, United

27    States Code, Sections 841(b)(1)(A).

Complaint - 2
*United States v. GALEANA GARCIA, et. al. /* MJ26-011

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    It is further alleged that this offense was committed during and in furtherance of

2  the offense alleged in Count 1 (Conspiracy to Distribute Controlled Substances).

3    All in violation of Title 21, United States Code, Sections 841(a)(1) and

4  841(b)(1)(A), and Title 18, United States Code, Section 2.

5    And the complainant states that this Complaint is based on the following

6  information:

7    I, GURMAN S. POWAR, being first duly sworn on oath, depose and say:

8    **AFFIANT'S BACKGROUND**

9    1.    I am a Special Agent with Homeland Security Investigations (HSI) and

10  have been so employed since October 2024. I am assigned to the HSI Blaine, Washington

11  office

12    2.    I am "an investigative or law enforcement officer" of the United States

13  within the meaning of Section 2510(7) of Title 18, United States Code, and is empowered

14  by law to conduct investigations of, and to make arrests for, offenses, enumerated in

    Section 2516 of Title 18, United States Code. I am authorized to investigate and enforce

15  violations of federal criminal statutes, including those in Titles 8, 18, and 21 of the

16  United States Code.

17    3.    I completed the Criminal Investigator Training Program (CITP), which is a

18  twelve-week program for all federal criminal investigators held at the Federal law

19  Enforcement Training Center (FLETC) in Glynco, Georgia. I also attended and

20  completed the Homeland Security Investigations Special Agent Training (HSISAT),

21  which is an additional eleven weeks of training also held at FLETC. I completed blocks

22  of instruction given on subjects including investigative techniques, federal controlled

23  substances laws, types of controlled substances and recognition, manufacturing

24  controlled substances, international transportation, distribution and sale methods, human

25  smuggling, human trafficking, immigration, money laundering techniques, electronic and

26  physical surveillance techniques, and constitutional law.

27

Complaint - 3
*United States v. GALEANA GARCIA, et. al.* / MJ26-011

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

4.      Prior to my employment with HSI as a Special Agent, I was employed by HSI as a Criminal Investigator student trainee in Blaine, Washington. During my employment as a Criminal Investigator student trainee with HSI, I earned a bachelor's degree in criminal justice from Washington State University.

5.      Based on my training and experience, and my consultation with more experienced law enforcement professionals, I have learned how drug traffickers operate, including how they store, move and sell their illicit products; how they launder the proceeds of the illicit sale of controlled substances; how they use cell phones and other communication channels to conduct their business; and that many drug traffickers possess firearms to protect themselves, their product and the proceeds of the sale of said product.

6.      The facts set forth in this Affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; interviews of cooperating witnesses; review of documents and records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience.

7.      Because this Affidavit is submitted for the limited purpose of establishing probable cause to arrest, this affidavit does not set forth each and every fact that I or others have learned during the course of this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe defendants have violated Title 21, United States Code 841(a)(1), Distribution of, and Possession with intent to Distribute, Controlled Substances; Title 21, United States Code, Section 841(a)(1) and 846, Conspiracy to Distribute Controlled Substances and other related offenses.

## SUMMARY OF PROBABLE CAUSE

8.      In June 2025, an HSI confidential informant, hereinafter the CI, reported that he/she had been in contact with an individual known to the CI as "Luis." "Luis" was later positively identified as Luis Donaldo GALEANA-Garica, following an undercover

1    meeting conducted on July 24, 2025, and will hereinafter be referred to as GALEANA.

2    Over a series of recorded telephone calls and text messages, the CI and GALEANA

3    discussed two drug transactions. The first drug transaction involved the sale of

4    methamphetamine to GALEANA and his associates, while the second drug transaction
     involved the purchase of fentanyl powder from GALEANA. The CI informed

5    GALEANA that his/her associate, (in reality, an HSI undercover agent, hereinafter the

6    UCA, posing as a drug trafficker), would contact GALEANA in order to finalize

7    negotiations. GALEANA corresponded with the CI utilizing two different telephone

8    numbers TT1 and TT2.

9         A.    **UCA Begins Communicating with GALEANA**

10        9.    In July 2025, the UCA began corresponding with GALEANA via recorded

11   telephone calls and text messages.  Again, the UCA was posing as a drug trafficker who

12   had access to large amounts of methamphetamine, but who was seeking a source of

13   supply for fentanyl and cocaine.  GALEANA was utilizing TT1 at this time. In substance,

14   the UCA and GALEANA discussed various drug transactions involving crystal
     methamphetamine, cocaine, and fentanyl powder. The UCA and GALEANA ultimately

15   agreed that the UCA would purchase two ounces of fentanyl powder from GALEANA at

16   the price of $1,100.00 per ounce. The purchase would be made with the understanding

17   that the UCA would purchase larger quantities of fentanyl from GALEANA during

18   subsequent drug transactions.

19        10.   The UCA and GALEANA both agreed to conduct the drug transaction on

20   July 24, 2025, in Bellingham, WA, and met on that date.  The two successfully concluded

21   a controlled purchase of approximately two ounces (approximately 60 grams) of a white

22   powdery substance that later field tested positive for fentanyl.  During this controlled

23   purchase, which was surveilled by other investigators, GLEANA was seen driving two

24   vehicles, a white BMW and a white Chevy Tahoe.  After the deal was concluded, the

25   UCA and GALEANA once again engaged in various drug negotiations ultimately

26   agreeing to conduct a larger drug exchange in the future.

27        B.    **UC Negotiations with GALEANA**

Complaint - 5
*United States v. GALEANA GARCIA, et. al. / MJ26-011*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

11.    Following the successful purchase of fentanyl from GALEANA, the UCA and GALEANA resumed negotiations via the encrypted Signal messaging application. I know, based on my training and experience, that sophisticated drug traffickers often prefer to use encrypted messaging applications such as Signal and WhatsApp, knowing that law enforcement can sometimes intercept unencrypted communications. Over a series of messages and recorded voice calls over the next several days, the UCA and GALEANA discussed purchase prices for ounce/kilogram quantities of fentanyl powder, kilograms of cocaine and pounds of methamphetamine, with GALEANA supplying the fentanyl and cocaine and the UCA claiming to have methamphetamine available. The negotiations included GALEANA sending the UCA pictures and a video of the purported cocaine on September 9, 2025.

 



### C. 9/16/2025 - Undercover Meeting with GALEANA and Cocaine Seizure

12.     On the morning of September 16, 2025, the UCA and GALEANA exchanged a series of text messages whereby they discussed the impending meeting in Bellingham. In substance, GALEANA informed the UCA that his associates would be traveling from Everett and furthermore made suggestions in regard to how the drug and currency exchange would take place.  GALEANA requested the UCA leave the 15 pounds of methamphetamine in UCA's vehicle parked at a public location. At that location, GALEANA and his associate would pick up the UCA and his associate (UCA2), who would be in possession of the $155,000.00 cocaine payment, drive to a secondary location where GALEANA would count the money.  Simultaneously, members of GALEANA's organization would take possession of the methamphetamine from the UCA's vehicle and place the box containing the cocaine inside UCA's vehicle.

13.     The UCA asked GALEANA if he was going to package the cocaine in a cardboard box as the UCA had previously requested. GALEANA acknowledged and said that he would.  Later that morning, GALEANA called the UCA and informed him that his associates would be traveling from Everett, thereby not requiring GALEANA to travel south. The UCA and GALEANA agreed to meet between 1:30 p.m. and 2:00 p.m.

14.     At approximately 1:45 p.m., The UCA and a second HSI UCA (hereinafter UCA2) were parked at the Cruisin Coffee located at 3906 Bennett Dr. in Bellingham, in preparation for the meeting with GALEANA.

15.     At 2:13 p.m., the UCA received a telephone call from GALEANA who requested UCA follow him to a parking garage. The UCA declined and told GALEANA to meet him at his current location, so that they could proceed to a secondary location where they could discuss the drug transaction in person. GALEANA acknowledged and said he was at the mall.  GALEANA further stated that his associate would arrive in 20 minutes.  This telephone call was recorded.

16.     At this time, agents and Task Force Officers (TFO) of the HSI Blaine office and an aircraft operated by an Air and Marine Operations (AMO) pilot and sensor operator who were on standby in support of the planned drug transaction were directed to

Complaint - 7
*United States v. GALEANA GARCIA, et. al.* / MJ26-011

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

surveille the Bellis Fair Mall located at 1 Bellis Fair Pkwy in Bellingham. At approximately 2:15 p.m., the ground surveillance team observed the white Chevy Tahoe, which was previously driven by GALEANA to the fentanyl controlled buy discussed above, parked in the Target Store parking lot. Shortly thereafter the AMO aircraft was directed into the location of the Chevy Tahoe and began to observe the activities that transpired from the air.

17.     The surveillance team, in collaboration with AMO, observed the Chevy Tahoe park next to a black Dodge Ram, and reported the interaction of the occupants of both vehicles. The drivers of both vehicles stepped out and exchanged greetings near the rear passenger door of the Chevy Tahoe. The driver of the Dodge Ram was later identified as Juan GARNICA-Pacheco, hereinafter GARNICA. The driver of the Chevy Tahoe was later identified as Luis Donaldo GALEANA-Garcia. A second individual wearing a white t-shirt, light colored pants, and backwards baseball cap, subsequently identified as Dustin BINION, stepped out of the Chevy Tahoe and sat in the front passenger seat of the Dodge Ram. Also at this time, a female individual, later identified as Lorena ESQUIVEL, stepped out of the front passenger seat of the Chevy Tahoe and sat in the driver's seat of the Dodge Ram.

18.     At 2:34 p.m., the UCA sent GALEANA a text message instructing him to meet the UCA at the Cruisin Coffee Shop.

19.     GALEANA ultimately retuned to the driver's seat of the Chevy Tahoe while GARNICA sat in the front passenger next to him. The Chevy Tahoe drove out of the Target parking lot and proceeded to the Cruisin Coffee Shop where it parked next to the UCA vehicle.

20.     Greetings were exchanged between the UCA and GALEANA at which point the UCA instructed GALEANA to follow him to a secondary location where they could further discuss the drug transaction. GALEANA agreed and followed the UCA vehicle to the Holiday Inn and Suites located at 4260 Mitchell Way in Bellingham, WA.

21.     At the Holiday Inn and Suites, the UCAs, GALEANA and GARNICA discussed the drug transaction that was to take place. GALEANA told the UCAs to

Complaint - 8
*United States v. GALEANA GARCIA, et. al.* / MJ26-011

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

follow him to the Bellis Fair Mall as the cocaine was currently at that location. The UCAs told GALEANA and GARNICA that they were in possession of currency and methamphetamine and as such were uncomfortable driving to the location as requested by GALEANA.

22.    At this time, UCA2 called a third undercover agent, UCA3, who was in a parking lot adjacent to the hotel. UCA3 was in possession of a duffel bag containing a large amount of sham U.S. currency, purported to be $155,000.00, and a separate black suitcase containing seven packages of crystal methamphetamine weighing approximately 15 pounds.

23.    UCA2 instructed UCA3 to drive to the Bellingham Inn and Suites to allow GALEANA and GARNICA-Pacheco to visually inspect the (sham) currency and crystal methamphetamine the UCAs were proposing to trade for the cocaine. The UCAs interactions with GALEANA and GARNICA-Pacheco at this location were audio and video recorded.

24.    A few minutes later, UCA3 arrived and parked behind the UCA vehicle. The UCA told GALEANA to accompany him to their associate's vehicle as he was in possession of the payment and crystal methamphetamine. GALEANA agreed, stepped out of the Chevy Tahoe, and walked over to UCA3's vehicle.

25.    As GALEANA stepped out of his vehicle, the UCA visibly observed a handgun tucked in the waistband at the small of GALEANA's back. As the gun became exposed, GALEANA attempted to cover it up with his shirt. GALEANA proceeded to UCA3's vehicle at which point UCA2 unzipped both the duffel bag containing the sham currency and the black suitcase containing the crystal methamphetamine. GALEANA visibly inspected the contents and returned to the Chevy Tahoe.  UCA3 immediately departed with the sham currency and methamphetamine.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Galeana Inspecting Sham Currency and Methamphetamine in UC Vehicle



26.     GALEANA returned to the Chevy Tahoe, at which point UCA2 handed GALEANA a piece of paper bearing the brand "3M" and requested he photograph the piece of paper on top of the cocaine shipment, thus demonstrating that he did in fact have the cocaine in his possession.  GALEANA agreed, took possession of the piece of paper, and drove out of the parking lot.

27.     The surveillance team proceeded to follow the Chevy Tahoe back to the Target parking lot. The Chevy Tahoe drove directly to the Target parking lot, making no stops in between. At the Target parking lot, GALEANA was once again observed interacting with the occupants of the Dodge Ram.

28.     The Chevy Tahoe parked adjacent to Dodge Ram, with both vehicles facing each other.  At this time, the individual wearing a white t-shirt, light colored pants, and backwards baseball cap (BINION), stepped out of the rear passenger side door of the Dodge Ram carrying a box, and walked over to the driver's side door of the Chevy Tahoe and handed GALEANA the box through the window.  The box appeared closed at this moment.  By this time, the Dodge Ram had pulled forward and parked next to the driver's side door of the Chevy Tahoe. BINION then walked over to the Dodge Ram and sat in the rear passenger side seat. Moments later, BINION returned to the Chevy Tahoe and retrieved the box through the driver's side window.  The box appeared to be opened as BINION transferred it from the Chevy Tahoe to the rear driver's side seat of the

Complaint - 10
*United States v. GALEANA GARCIA, et. al. / MJ26-011*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Dodge Ram. BINION then sat in the rear driver's side passenger seat of the Dodge Ram where he had placed the box. I know, based on my training and experience, and my knowledge of the investigation, that this observed conduct is consistent with a drug transaction.

29.    At 3:08 p.m., the box was in possession of GALEANA.  At this time, GALEANA sent the UCA a photograph of a cardboard box containing packing peanuts and a rectangular package. Also in the photograph was the piece of paper that UCA2 had provided GALEANA at the Holiday Inn and Suites. GALEANA also sent a video file, once again with the piece of paper provided to him by UCA2, and the same box displaying rectangular packages. In the video, GALEANA's left hand could be observed touching the rectangular packages.  The UCA recognized the hand in the video as GALEANA's as the back of the hand depicted a face tattoo.  This is the same as the tattoo observed on GALEANA's left hand in a photograph later retrieved from the Chevy Tahoe following the execution of a search warrant at the conclusion of this operation.

<u>Photos Sent to UCA from GALEANA:</u>

 

Complaint - 11
*United States v. GALEANA GARCIA, et. al.* / MJ26-011

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Screenshots from GALEANA Video



Closeup of GALEANA's Hand from Photo Recovered in Tahoe



Complaint - 12
*United States v. GALEANA GARCIA, et. al. / MJ26-011*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

30.     Following these events, the AMO surveillance aircraft followed the Dodge Ram to a trailer park located at 4015 Eliza Ave in Bellingham, WA, while a separate HSI ground surveillance team followed the Chevy Tahoe out of the Target parking lot.  The AMO aircraft maintained constant surveillance of the Dodge Ram from the Target store to the trailer park.  HSI agents contacted Whatcom County Sheriff's Office (WCSO) Deputies and informed them of the events that had transpired during the surveillance operation. WCSO Deputies E. Strand and J. Hentz were near the Target parking lot and proceeded into the trailer park where they located the Dodge Ram parked at a trailer labeled with a for-sale sign.

31.     Deputies Strand and Hentz approached and interviewed both occupants of the vehicle.  The driver of the Dodge Ram was identified as Lorena ESQUIVEL, while the passenger, who at the time of the encounter was seated in the rear driver's side passenger seat next to the carboard box, was identified as Dustin Ray BINION.

32.     Deputy Hentz requested the assistance of WCSO Deputy Streubel and his drug detection K9 Apex.  Deputy Streubel arrived and deployed K9 Apex around the Dodge Ram.  Deputy Streubel informed that K9 Apex had alerted to the odor of narcotics.  While the inspection was taking place, Deputy Strand observed ESQUIVEL become extremely nervous.  When asked about her nervousness, ESQUIVEL stated that she suffered from anxiety.

33.     ESQUIVEL and BINION were uncooperative and because of the events that had taken place, Deputy Strand impounded the Dodge Ram pending further investigation.

34.     Once the Dodge Ram was secured, Group Supervisor (GS) Brian Faria requested the AMO aircraft assist with surveillance of the Chevy Tahoe, which was mobile in Bellingham. The AMO aircraft sensor operator observed the Chevy Tahoe park in a business park located at 120 W Stuart Street in Bellingham, where GALEANA and GARNICA abandoned the vehicle by walking north and west through the business park and were eventually lost during surveillance.

Complaint - 13
*United States v. GALEANA GARCIA, et. al.* / MJ26-011

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

35.    GS Faria and SA Gurman Powar later requested the assistance of Deputy Streubel and his K9 with the investigation of the Chevy Tahoe. Deputy Streubel arrived on scene, deployed his K9 Apex who alerted to the presence of narcotics at the driver's side door of the Chevy Tahoe. Deputy Streubel subsequently requested a tow for the Chevy Tahoe pending the acquisition of a search warrant.

36.    Once the Dodge Ram and Chevy Tahoe were secured at the WCSO, Deputy Strand applied and received a search warrant via the Superior Court in Whatcom County thus authorizing a search of the Dodge Ram and Chevy Tahoe.

37.    In the Dodge Ram, Deputy Strand discovered a cardboard box which contained 10 rectangular packages covered with packing peanuts. Each package was wrapped in clear plastic, then black electrical tape, imprinted with "Thor's Hammer" and an image of the comic character Thor.

38.    Deputy Strand further discovered a 9mm Colt Commander, serial number 70SC40901 and a blue Apple iPhone with a clear plastic protective case bearing numerous "C" markings which was found in the center console. The firearm was registered to Juan Pacheco of Kirkland, WA. The handgun contained a magazine with nine rounds; the chamber was empty. Moreover, Deputy Strand discovered what appeared to be residential leasing documents for the Park 88 Residences located at 88 102nd Ave NE #801 in Bellevue, WA, with parking space of #125. HSI Blaine agents later issued a subpoena to the Park 88 Residences revealing subject Juan Carlos PACHECO (believed to be a variation on GARNICA's name) to be the individual leasing unit 801.

39.    Deputy Strand and Streubel then conducted a search of the Tahoe. Deputy Streubel located three packing peanuts on the driver's floorboard. The packing peanuts matched the packing peanuts contained within the box of cocaine that was seized from the Dodge Ram. Deputy Strand and Struebel also found a photograph depicting GALEANA's hand, same as the tattooed hand observed in the photos and videos depicting the packages of cocaine (a close-up version of which was shown above).

Complaint - 14
*United States v. GALEANA GARCIA, et. al.* / MJ26-011

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



40.     On September 18, 2025, Deputy Strand field tested the powdery white substance contained in one of the packages utilizing a NARTEC Inc. Cocaine Detection Kit.  The substance yielded positive results for the properties of cocaine.  The total weight of the cocaine was 10.8 kilograms.

 

Complaint - 15
*United States v. GALEANA GARCIA, et. al.* / MJ26-011

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

 

2

3

4

5

6

7

8

9

10

11

12

13    **E.    September 24, 2025, Juan GARNICA Retrieves Dodge Ram**

14          41.    On September 24, 2025, Deputy Strand informed SA Maldonado that Juan

15    Carlos GARNICA-Pacheco, had made arrangements to pick up the Dodge Ram from the

16    WCSO, as he was the registered owner of the vehicle. Deputy Strand recorded the

17    interaction with GANICA utilizing his body camera.

18    **F.    October 28, 2025, Interview of BINION**

19          42.    In October 2025, WCSO Deputy Strand informed HSI agents that BINION

20    was being detained at the Whatcom County jail on various local charges to include

21    narcotics and firearms violations unrelated to the HSI criminal investigation.

22          43.    On October 28, 2025, HSI agents conducted an interview of BINION at the

23    Whatcom County Jail.  Agents advised BINION of his Miranda Rights.  BINION

24    acknowledged the rights read to him and agreed to speak to agents without an attorney

25    present.  Agents asked BINION questions specific to the cocaine seizure that had taken

26    place on September 16, 2025.  BINION provided an account of the events of that day

27    which corresponded with the information as reported by the surveillance team.  BINION

Complaint - 16
*United States v. GALEANA GARCIA, et. al. / MJ26-011*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  stated that prior to the seizure of cocaine, he was in a Chevy Tahoe with Lorena
2  ESQUIVEL and a second individual who he came to know as "no name." BINION
3  confirmed "no name," the driver of the Tahoe, to be GALEANA via a photograph shown
4  to him by the agents. ESQUIVEL had informed BINION she needed a "second set of
5  eyes" and as such BINION agreed to accompany GALEANA and ESQUIVEL.
6  GALEANA drove them to the Target parking lot at the Bellis Fair Mall where they met
7  up with an individual whom BINION identified as Juan GARNICA.  The identification
8  of GARNICA was made via GARNICA's State of Washington driver's license
9  photograph and a second photograph captured on September 24, 2025, while GARNICA
   retrieved the Dodge Ram from the WCSO.

10      44.    BINION stated that GARNICA was driving a Dodge Ram pickup truck,
11  however, GARNICA left the Target parking lot in the Chevy Tahoe with GALEANA
12  while he (BINION) and ESQUIVEL drove away in the Dodge Ram. While in the Dodge
13  Ram, ESQUIVEL showed BINION a bag on the floor containing numerous packages of
14  cocaine with "Thor" stickers attached to the wrappings of each package.  ESQUIVEL
15  asked BINION to place the cocaine into a cardboard box which BINION had transferred
16  from the Chevy Tahoe to the Dodge Ram. BINION said that he placed all 10 kilograms
17  of cocaine into the box while ESQUIVEL video recorded him doing so. BINION then
18  added packing peanuts into the box.  ESQUIVEL and BINION subsequently returned to
   the Target parking lot.

19      45.    Shortly thereafter, the Chevy Tahoe arrived back to meet them at the Target
20  parking lot. ESQUIVEL asked BINION to take the box containing the cocaine to
21  GALEANA who was in the driver seat of the Chevy Tahoe.  BINION observed
22  GARNICA in the passenger seat of the Chevy Tahoe.  A short time later, BINION
23  retrieved the box from GALEANA.  ESQUIVEL told BINION that GALEANA needed
24  to take a photograph of the cocaine.

25
26
27

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      Based on the above facts, I respectfully submit that there is probable cause to

2 believe that LUIS DONALDO GALEANA GARCIA, JUAN CARLOS GARNICA

3 PACHECO, LORENA ESQUIVEL, and DUSTIN RAY BINION did knowingly and

4 intentionally conspire to distribute controlled substances including cocaine, fentanyl and

5 methamphetamine, and did possess and aid and abet the possession of, cocaine, in

6 violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), 846 and Title

7 18, United States Code, Section 2.

 

 

                                                _____

Gurman Powar, Complainant
Special Agent, Homeland Security
Investigations

 

     Based on the Complaint and Affidavit sworn to before me, and subscribed in my

presence, the Court hereby finds that there is probable cause to believe the Defendants

committed the offenses set forth in the Complaint.

     Dated this 8th day of January, 2026.

                                                _____

The Hon. Michelle L. Peterson
United States Magistrate Judge

Complaint - 18
*United States v. GALEANA GARCIA, et. al.* / MJ26-011

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970